B. M. SULLIVAN, *Appellant*, v. CITY OF TAMPA, a municipal corporation, *Appellee*.

En Banc.

Opinion filed April 23, 1931.

300

*Charles F. Blake,* Attorney for the Appellant;
*Karl E. Whitaker,* Attorney for the Appellee.

BROWN, J.—The Circuit Court of Hillsborough County, by its final decree entered March 19th, 1931, validated an issue of Two Hundred Thousand ($200,000.00) Dollars of Refunding Bonds by the City of Tampa, a Municipal Corporation in Hillsborough County, Florida, for the purpose of refunding $200,000.00 of permanent improvement notes of said municipality, and the proceedings taken to authorize the issuance of said bonds, which were alleged in the petition for validation filed in said proceeding.

The issue of Refunding Bonds is to bear date of May 1, 1931, and consists of two hundred (200) bonds of the denomination of One Thousand ($1,000.00) Dollars each, bearing interest at the rate of five and one-half (5½%) per centum per annum, payable semi-annually, and which mature serially over a period of from three to twenty-five years from date.

In proceeding to issue its said Refunding Bonds the City of Tampa acted under Chapter 11855, Laws of Florida, 1927. Proceeding under this Act the Board of Representatives of said City as its governing authority did, on the 17th day of February A. D. 1931, adopt a resolution authorizing the issuance of said $200,000.00 of Refunding Bonds

to refund $200,000.00 of Permanent Improvement Notes theretofore issued by said City.

At the time of the adoption of said Resolution there were outstanding and unpaid $200,000.00 of Permanent Improvement Notes of the City of Tampa the issuance of which had been theretofore authorized under Chapter 11764, Laws of Florida 1925, Special Session, entitled— "AN ACT Authorizing the City of Tampa to Issue a Limited Amount of Public Improvement Notes and Bonds Without a Vote of the People," the issuance of which Permanent Improvement Notes had been authorized by Resolution No. 2075-A, entitled: "A Resolution Authorizing $200,000.-00 Permanent Improvement Notes under Chapter 11746 Laws of Florida 1925, Special Session, and Resolution 3148-A, entitled: "A Resolution Authorizing $200,000.00 Permanent Improvement Notes under Chapter 11764 Laws of Florida, 1925, Special Session," duly passed by the City Commission of the City of Tampa on the 30th day of March 1926 and 1st day of February 1927, respectively. All of the Permanent Improvement Notes so authorized bore interest at the rate of five per cent (5%) per annum, payable semi-annually, and all of said notes are due and payable on the first day of May, 1931.

At the time of the adoption of the resolution authorizing the issuance of the $200,000.00 of Refunding Bonds there remained outstanding an aggregate of $200,000.00 of such Permanent Improvement Notes, bearing interest at the rate of five per centum (5%) per annum, and which mature May 1, 1931; said Permanent Improvement Notes are by Chapter 11764, Laws of Florida, 1925, Special Session made the direct obligation of the City of Tampa, and said notes on their face purport to be general obligations of said City, for the payment whereof, both principal and in-

terest as the same shall fall due, the full faith, credit and resources of said City were irrevocably pledged.

In adopting resolution No. 963-B, authorizing the issuance of the $200,000.00 of Refunding Bonds of the City of Tampa to refund the $200,000.00 of Permanent. Improvement Notes the Board of Representatives of said City purported to be acting in accordance with and as authorized by the provisions of Chapter 11855, Laws of Florida, 1927, entitled: "AN ACT to Authorize the Issuance of Refunding Bonds by Counties, Cities, Towns and Other Municipal Corporations and Taxing Districts and to ' Provide for Their Payment," and after having found and declared the $200,000.00 of Permanent Improvement Notes of said City Issued as aforesaid to be an existing indebtedness of the City of Tampa lawfully made and undertaken by said City, by authority of law, the same were determined and declared to be existing, valid and binding obligations of the City of Tampa for the full payment of which the credit of said City is lawfully pledged. Said resolution then purported to authorize the issuance of $200,000.00 of Refunding Bonds, to consist of $200,000.00 negotiable coupon bonds of the denomination of $1000.00 each, numbered 1 to 200 both inclusive, dated May 1st, 1931, bearing interest at the rate of 5½% per annum, payable semi-annually on the 1st days of May and November of each year, the principal thereof to be payable in annual serial installments maturing May 1st. Said resolution further declared that said Refunding Bonds should be the general obligations of the City of Tampa, and that for the payment of each of said bonds and interest as the same should fall due the full faith, credit and resources of the City should be irrevocably pledged, and that for the payment of such bonds and interest there should be levied annually upon all taxable

property within the corporate limits of the city a sufficient tax to provide for the payment of said bonds and interest thereon at maturity. Said resolution further authorized and empowered the Mayor of said City to sell said Refunding Bonds at private sale, provided that none of said Refunding Bonds should be sold at not less than ninety-five per cent of their par value and accrued interest to date of delivery. No provision was made in said resolution for the holding of an election wherein and whereby the issuance of said Refunding Bonds might be approved by a majority of the votes cast in said election in which a majority of the freeholders who were qualified electors residing in said City of Tampa should participate, and no election was ever held in said City for the purpose of authorizing the issuance of said Refunding Bonds.

On March 19th, 1931, the State Attorney for the Thirteenth Judicial Circuit of Florida, filed his Answer objecting to the validation of said bonds as unauthorized and incorporating in his answer the Answer filed in said cause by the intervenor and respondent, B. M. Sullivan.

On March 19th, 1931, the Appellant, B. M. Sullivan, as intervenor, filed an Answer to the Petition setting forth certain alleged causes why the bonds should not be validated as prayed for in the petition.

Certain proofs were taken before the Honorable L. L. Parks, Judge of said Court, on March 19th, 1931, said proofs consisting of certain testimony, together with Exhibits "A" to "C" inclusive which are attached to the petition for validation.

On March 19th, 1931, the return day, the cause came on for final hearing and the Court entered a final decree in accordance with the prayer of the petition.

The appellant, B. M. Sullivan, Intervenor in the Court

below, duly entered an appeal from said final decree to this court and has assigned various errors in the final decree.

The validity of the $200,000.00 Permanent Improvement Notes of the City of Tampa which it is seeking to refund is not in issue. There is no contention by the Intervenor that the original obligations sought to be refunded by the City of Tampa were not obligations of the entire territory of the City of Tampa at the time it authorized the issuance of its refunding bonds. There is no contention by the Intervenor that the refunding bonds were issued in violation of any of the provisions or requirements of Chapter 11855, Laws of Florida, 1927.

We will first consider the contention of appellant that the City of Tampa was not authorized to proceed under the general refunding statute, Sec. 11855, Laws of 1927, but was limited to proceeding under the provisions of Chap. 14420, Laws of 1929, being a special act to authorize and provide for the issuance of refunding bonds by the City of Tampa. If this contention be well founded, it would hardly be necessary to consider the other questions involved.

The general rule is that where there is a valid local or special law relating to the powers and government of a particular municipality that is in conflict with the general statute, such local or special act will prevail. City of Apalachicola vs. The State, 93 Fla. 921, 112 So. 618; State v. City of Avon Park, 96 Fla. 494, 118 So. 233. Sec. 24 of Art. III of the Constitution provides: "The legislature shall establish a uniform system of county and municipal government which shall be applicable, except in cases where local or special laws are provided by the legislature that may be inconsistent therewith." It is urged that

Chap. 14420, being a special act to authorize and provide for the issuance of refunding bonds by the City of Tampa, is inconsistent with the general act, Chap. 11855, in that under the general law provision is made that the refunding bonds issued thereunder shall bear interest at a rate not exceeding 6% per annum, and that said bonds should not be sold for less than 95% of their par value and accrued interest to date of delivery, whereas the special act provides that the refunding bonds issued thereunder shall bear interest not to exceed 5% per annum and shall not be sold for less than their par value and accrued interest to date of delivery.

But said special act, 14420, does not contain the usual clause repealing any other laws or parts of laws in conflict therewith, and *does* contain the following provision, being Section 10 of said Act:

"Notwithstanding the provisions hereof, or any other provisions in its charter, the City of Tampa shall have the right, at its option, to issue refunding bonds for the purpose of refunding any lawful bonds, notes or other obligations for the payment of which the credit of said City is lawfully pledged, in accordance with the provisions of any general laws now in force or which may be hereafter enacted relating thereto."

This Section of the Special Act gives to the City of Tampa the right and power, at its option, either to issue refunding bonds in accordance with the provisions thereof, or in accordance with the provisions of any general laws then in force or which might be thereafter enacted relating to the issuance of refunding bonds. Thus the clear intent of Chapter 14420, according to its own language was that it should not supersede or repeal any power then vested in the City under general law. There is therefore

no such inconsistency as is contended for, as the special act preserves the City's right to issue refunding bonds in accordance with the provisions of the general laws. See State v. City of Brooksville, 96 Fla. 141, 118 So. 13, and Abell v. Town of Boynton, 95 Fla. 984, 117 So. 507. The provisions in Sec. 10 of Chap. 14420 are stronger than those contained in Sec. 24 of Chap. 10354, construed in the Brooksville case. The intent of Sec. 10 of Chap. 14420 was evidently to provide an additional and supplemental method of providing for the issuance of refunding bonds by the City of Tampa, at the same time leaving it optional with the City to issue refunding bonds under the general Statute, Chap. 11855, if it so desired. Therefore the rule of statutory construction laid down in the Apalachicola and Avon Park cases, above cited, is not here available.

It is next contended that the court below erred in holding that under the amendment to Sec. 6 of Art. IX of the Constitution, adopted in 1930, the City of Tampa had authority to issue its refunding bonds for the purpose of refunding its outstanding *notes*, of the character hereinabove described, for the payment of which the credit of the municipality was pledged, without the issuance of such bonds having been approved by the majority of the votes cast in an election in which the majority of the freeholders who are qualified electors residing in such municipality shall have participated.

The outstanding obligations which the City of Tampa proposed to refund were issued pursuant to the provisions of Chap. 11764, Laws of Fla., Special Session of 1925, entitled: "An Act Authorizing the City of Tampa to issue a limited amount of public improvements notes and bonds without a vote of the people". In the first Section of the Act, the obligations authorized are referred to as "notes",

to be made payable not more than five years from their date, whereas in other portions of the Act the words notes and bonds are both used. All obligations issued under the Act are made the general obligations of the City of Tampa. The City was given authority to give such obligations "any designation which is indicative of the class of improvements for which the indebtedness evidenced or refunded thereby was created". The obligations were designated by the City as "Permanent Improvement Notes". They might just as well have been designated as "Permanent Improvement Bonds". The form of the permanent improvement notes as presented in the resolution authorizing them is substantially the same as the form used for bonds. It is provided that such obligations shall be of $5000.00 and $1000.00 denominations respectively. They contain a promise by the City to pay the bearer, or if registered to the registered owner thereof, upon a certain date, said respective sums with interest at a fixed rate payable semi-annually upon surrender of annexed interest coupons, and for the payment thereof the full faith, credit and resources of the City are pledged. Provision is made for the registration of such obligations as to both principal and interest.

In Cheney v. Jones, 14 Fla. 587, text 611, it was said:

"Common honesty is quite as respectable on the part of the State as in an individual, and hence the State will be honest and not repudiate. But the debt is perhaps too much to be paid by our people at once, and they may prefer to pay in installments with interest. And what is a State bond but a *promise* to pay the principal and interest of its debts, equally binding upon us, whether it be in the form of a bond or an open indebtedness?"

In Hubert v. City of Vero Beach, 93 Fla., 323, 112 So., 53, this court held that a statute authorizing the valida-

tion of bonds and certificates of indebtedness authorized the validation of time warrants, as they were certificates of indebtedness within the intent and meaning of the validating act, citing the case of Denver v. Home Saving Bank, 236 U. S. 101, 35 S. C. 265, 59 L. ed., 485, in which case MR. JUSTICE HOLMES, speaking for the Court said:

"What is true about bonds is true about certificates of indebtedness. Indeed it is difficult to see any distinction between the two as they are commonly known to the business world. The essence of each is that they contain a promise, under the seal of the corporation, to pay a certain sum to order or to bearer."

It might be noted that the obligations here in question are promises to pay the principal and interest of a debt, under the seal of the City of Tampa, and are made payable to bearer.

In Re-Advisory Opinion to Governor, 94 Fla. 967, 114 So. 850, in construing Sec. 6 of Art. IX of the Constitution prior to its amendment, this court held that the limitations therein contained upon the power of the State to issue bonds applied also to the issuance of promissory notes by the State Road Department, a component part of the State Government.

It is quite clear that these so-called "Permanent Improvement Notes" were, in substance and in legal effect, bonds, and they reasonably and fairly may be regarded as bonds within the meaning of Sec. 6, Art. IX of the Constitution as amended in 1930, pursuant to Senate Joint Resolution No. 26, approved June 8, 1929, and appearing on page 784 of the General Laws of 1929.

It might be noted in this connection that the general refunding Act of 1927, Chap. 11855, provides for the issuance of refunding bonds for the purpose of "refunding

any bond, note, certificate of indebtedness or other obligation for the payment of which the credit of said county, city, town, municipal corporation or taxing district is pledged, at or prior to maturity in the manner provided in this Act''.

To hold that instruments given the technical designation of bonds could be refunded, and to then say that other obligations having all the essential characteristics and attributes of bonds, and which are in fact bonds save in name only, cannot be refunded, would be disregarding the substance and giving effect only to the form of the constitutional amendment.

We come now to the third and last contention of the appellant, which raises a very important question.

It is insisted that the City of Tampa could not lawfully issue refunding bonds at a higher rate of interest than the obligations which are to be refunded, nor may such refunding bonds be sold for less than their par value as authorized by Chap. 11855, Laws of 1927, without the issuance of such refunding bonds having been first approved by a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in such municipality shall have participated. It is earnestly argued that to issue refunding bonds of the character above mentioned, without their first being authorized by an election, would be in conflict with Section 6, of Art. IX as amended.

Section 6 of Art. IX of the Constitution as it existed before the recent amendment reads as follows:

"The legislature shall have power to provide for issuing State bonds only for the purpose of repelling invasion or suppressing insurrection, or for the purpose of redeeming or refunding bonds already issued at a lower rate of interest."

Section 6 of Art. IX as amended at the general election held November 4, 1930, is as follows:

"The legislature shall have power to provide for issuing State bonds only for the purpose of repelling invasion or suppressing insurrection, and the counties, districts or municipalities of the State of Florida shall have power to issue bonds only after the same shall have been approved by a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in such counties, districts, or municipalities shall participate, to be held in the manner to be prescribed by law; but the provisions of this law shall not apply to the refunding of bonds issued exclusively for the purpose of refunding of the bonds or the interest thereon of such counties, districts, or municipalities."

It will be observed that the section as amended omitted the words, "or for the purpose of redeeming or refunding bonds already issued at a lower rate of interest". However, we do not deem that this omission has any bearing upon the question now before us. At the time of the adoption of this amendment, there were no State bonds outstanding, and as the amendment, like the original section, prohibits the issuance of State bonds except for the purpose of repelling invasion or suppressing insurrection, there was no apparent need for retaining the clause relating to the refunding of State bonds. It is quite plain that the main purpose of the amendment was to prevent the counties, districts, and municipalities of this State from issuing any bonds, except refunding bonds, without first obtaining the approval of a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in the territory to be affected, shall have participated.

In Amos et al. v. Mathews, 99 Fla. 1, 126 So. 308, this court, speaking through MR. JUSTICE STRUM, said:

"Constitutional restraints, therefore, may be found either in the express language employed or in the purpose clearly, though impliedly, evidenced thereby. The object of constitutional construction is to ascertain and effectuate the intention and purpose of the people in adopting it. That intention and purpose is the 'spirit' of the Constitution—as obligatory as its written word. That spirit, however, can not consist of mere sophistry nor or fanciful or conjectural theory. It must be found in those implications and intendments which clearly flow from the express mandates of the Constitution when considered in the light of circumstances and historical events leading up to its adoption, from all of which the purpose of the people in adopting it is to be gleaned."

And this court has already shown, in the opinion by MR. JUSTICE WHITFIELD in State v. City of Miami, 131 So. 143, that the court is not disposed to place such a narrow and technical construction upon this amended section of the Constitution as would defeat its evident intent and purpose. Nor, on the other hand, should its wholesome prohibitions be impaired by any such method of construction. As was said in an Advisory Opinion to the Governor, 94 Fla. 967, 114 So. 850, in construing this section of the Constitution before its amendment:

"The spirit as well as the letter of this Section should be preserved and given full force and effect. Its purpose should not be defeated or frittered away by any narrow or technical construction".

It has elsewhere been said that:

"The fundamental purpose in construing a constitutional provision is to ascertain and give effect to the intent of the framers and of the people who adopted

it. This court, therefore, should constantly keep in mind the object sought to be accomplished by its adoption, and the evils, if any, sought to be prevented or remedied. Constitutional provisions are presumed to have been more carefully and deliberately framed than is the case with statutes; hence it is sometimes said that less latitude should be indulged by the courts in their construction. On the other hand, it is a well settled principle of constitutional construction that such construction should be neither liberal nor strict, but the courts should aim to give effect to the purpose indicated by a fair interpretation of the language used.'' 12 C.J. 700.

It might also be noted that at the time this constitutional amendment was framed and adopted by the electorate of the State, Chap. 11855, Laws of 1927, a general statute, was in full force and effect. This statute, as we have seen, authorized the issuance of refunding bonds by counties, municipal corporations and taxing districts, which should bear a rate of interest not exceeding 6% per annum, and which might be sold at public or private sale for not less than 95% of the par value and accrued interest to date of delivery, without requiring such refunding to be first authorized by a vote of the people in an election. There is no contention here that this act was in any wise invalid at the time of its adoption, and many refunding bonds have been issued thereunder, the validity of some of which have been favorably passed upon by this court. Obviously, this general statute still remains valid law unless it has been superseded or impliedly repealed, in whole or in part, by the constitutional amendment set forth. The legislature, in submitting the amendment, and the people in adopting it, must have had notice and knowledge of this general statute.

It is a matter of common knowledge in this State that prior to the adoption of the amendment, and especially during the boom period during the years 1924 to 1926, the counties, districts, and municipalities of the State had issued bonds, notes and other obligations involving hundreds of millions of dollars; that the issuance of a large part of these obligations had been authorized without a vote of the people, or in many cases, when a vote had been had a very small portion of the voters had actually participated in the election. After the collapse of the boom and the return to a more sane condition of the public mind, there arose a strong sentiment among our people that no further bonded indebtedness should be issued or incurred without first securing the approval of a majority of the votes of the people upon whom the burden would fall. But the existence of the large amount of outstanding obligations, many of which had matured, or were about to mature, rendered it necessary that some provision should be made which would authorize the refunding of these existing and maturing obligations without the expense and delay of a preliminary election, otherwise immediate defaults would in many cases have occurred before the machinery for holding an election could have been put in motion and its function completed. Such conditions must have been in the minds of the framers in proposing, and of the people in adopting, such amendment. May it not be said that the intent of the people was to prevent further abuse of the power to issue new and additional obligations, while at the same time facilitating the refunding of existing obligations already outstanding? Such obligations were not to be repudiated; they had to be paid or refunded. While the main evil sought to be prevented or remedied by the amend-

ment was the further increase of the bonded indebtedness of the several counties, municipalities and districts of the State except upon the authority of the people expressed in an election, it was also necessary that provision be made for authorizing the refunding of existing obligations, and even "the interest thereon". There was certainly no intent that this power of refunding should be impaired or unduly burdened. It might also reasonably be said that by the adoption of Chapter 11855, in 1927, the legislature took notice of the fact that it would be practically impossible for many of the counties, municipalities and districts of the State to refund their outstanding bonds at the same rate of interest attached to the original obligations or to sell such refunding bonds at their full par value; for, by said act, the legislature authorized such refunding bonds to be issued at not to exceed 6% and authorized their sale at not less than 95% of their par value and accrued interest, as above noted.

The constitutional amendment unquestionably authorizes the issuance of refunding bonds without a vote of the people, and this court would not be authorized to add to the language of the constitutional amendment a condition not therein expressed; that is, by addition of a provision that such refunding should not be permitted unless the refunding bonds should bear no higher rate of interest than the original obligations and should not be sold for less than their full par value. It is the function of this court to construe and interpret constitutional amendments and not to make them. The constitutional amendment plainly provides for the issuance of refunding bonds issued exclusively for the purpose of refunding the bonds or the interest thereon of such counties, districts or municipalities. The dictionary meaning of the word

"refund", is "to fund again or anew; to replace (a fund or loan) by a new fund." It is also a matter of common knowledge that refunding obligations cannot always be accomplished without holding out to the creditor some inducement in the form of an increase in the rate of interest or otherwise, which would cause him to be willing to surrender his existing bonds and take the refunding bonds instead.

While the two cases involve different provisions, and no question of an increase in the interest rate was involved in the case of Davis v. Dixon, 98 Fla. 87, 123 So. 536, the language used in the opinion of MR. JUSTICE STRUM in that case, and which was quoted by MR. JUSTICE BUFORD in State v. City of Okeechobee, 99 Fla. 617, 127 So. 339, has some significance in this case. The opinion in Davis v. Dixon reads in part as follows:

"We are aware of the well nigh universal general rule that even where a constitutional provision requires a vote of the electors to originally authorize the incurring of an indebtedness, or the original issuance of bonds, no such election is necessary to the issuance of refunding bonds pursuant to statute for the purpose of discharging outstanding bonds originally issued in accordance with the constitutional requirement, so long as the refunding bonds create no additional or increased liability on the part of the obligor, unless, of course, the statutory or other authority under which the refunding bonds are issued requires a resubmission to the electorate. The theory of the case so holding is that since the bonds are not the debt isself, but the legal evidence of the existence of the debt, the issuance of refunding bonds for the purpose of discharging an existing legal indebtedness, originally incurred in accordance with the constitutional requirement, does not create a new debt or impose any new

liability against the taxpayers or their property within the meaning of such constitutional provision, but merely renews and continues, in a changed form, the original existing indebtedness which was originally created in conformity with the Constitution, and that such constitutional provision therefore does not prohibit the renewal, without a vote, of the previously existing valid debt, so long as no additional or increased liability is created. The fact that interest must be paid upon the refunding bonds during the additional renewal period would not impose an additional or increased liability as contemplated by that rule because if the original bonds were allowed to rest in default they would continue to draw interest. The result, therefore, would be the same in dollars and cents, except in cases where the legal rate is higher than the contract rate on the bonds and in certain States where the rule prevails that bonds in default shall draw interest during the period of default at the legal rate and not the contract rate. Under those circumstances it would be more expensive to permit the bonds to rest in default than to refund them, and such additional expense would be prevented by the issuance of refunding bonds.''

And so in this case it is contended by appellee that it would be more expensive to permit the bonds to go to default than to refund them, because the holder could very easily reduce them to judgments which would bear interest at 8%. In construing constitutional or statutory limitations on the amount of bonded indebtedness which a municipality may incur, the general rule is that the question of whether the limitation is exceeded by a particular issuance of bonds must be determined as of the time of the actual issuance of the bonds, and that interest to accrue in the future will not be included in com-

puting the amount of bonds which may be issued. 44 C.J. 1188, and cases therein cited. Nor will a municipality be held to have incurred a new debt or increased its indebtedness within the meaning of such limitations when it funds or extends an existing indebtedness by the issuance of refunding bonds, 44 C.J. 1132. See also note in 37 L.R.A., page 1106.

A case closely in point with the case at bar, is that of Lawrence County vs. Jewell, decided by the unanimous opinion in a strong Circuit Court of Appeal, consisting of Circuit Judges Sanborn, Thayer, and Caldwell, 100 Fed. Rep. 905. It was held in that case that an act of Congress which, among other things, limited the power of territories and subdivisions thereof to contract indebtedness, but provided that "nothing in this act shall be construed to prohibit the refunding of any existing indebtedness of such territory, or of any political or municipal corporation, county, or other subdivision therein," was not intended to restrict the powers of territories or of such subdivisions therein in dealing with their past fiscal transactions, but left them at full liberty to refund their debts in any of the customary ways, including the selling of new securities for the purpose of redeeming those outstanding, subject only to the requirements of good faith in the exercise of such power; and that new bonds so issued by a county, and sold for the purpose of redeeming outstanding bonds bearing a higher rate of interest, are not rendered invalid because sold at a discount of ten per cent., permitted by a statute of the territory, where the transaction was conducted in good faith.

It will be noticed that the only limitation upon the power of counties, districts, and municipalities to issue

refunding bonds which is contained in the constitutional amendment is, that such bonds be issued exclusively for the purpose of refunding the bonds or the interest thereon of such counties, districts or municipalities. The constitutional provision contains no express language which purports to fix or limit the rate of interest which the refunding bonds shall bear, or to fix the price at which they may be sold. Being wholly silent as to such matters, and no such limitations being clearly implied from the use of the terms in the amendment itself, none will be implied by the court.

Nowhere in the record of this case is it shown or alleged that the refunding bonds or the proceeds thereof are intended to, or will be, issued for any other purpose than the express purpose of refunding the designated outstanding obligations of the City, so that the City may obtain an extension of time for the payment of the indebtedness represented by the obligations refunded. The good faith of the refunding proceedings is not questioned. That the mere issuance of refunding bonds creates no new indebtedness was settled by this court in the cases of Davis v. Dixon and State v. City of Okeechobee, *supra*.

Neither does the fact that the proposed refunding bonds may be sold at less than their par value increase the bonded debt of the City. It is not proposed to sell $210,000.00 of these refunding bonds to pay the $200,000.00 due on the outstanding notes. No authority purports to have been given to do this. It is quite probable that the difference between the amount which may be realized from the sale of the refunding bonds and the amount of the original obligations which are to be refunded must be paid out of the general funds of the

City, but if this is done it will not increase the bonded debt of the City.

We conclude therefore that the constitutional amendment above described did not deprive the legislature of the power to authorize a county, municipality or district to issue refunding bonds at a rate of interest not to exceed 6% and to sell them at not less than 95% of their par value and accrued interest to date of delivery, as provided in Chap. 11855.

Finding no error in the record, the decree of the chancellor validating the bonds above mentioned is hereby affirmed.

Affirmed.

BUFORD, C.J., AND WHITFIELD, TERRELL AND DAVIS, J.J., concur.

ELLIS, J., concurs in the conclusion.